WILLIAM I. AND ADELE B. FINE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fine v. Commissioner
Docket No. 21245-85
United States Tax Court
T.C. Memo 1995-222; 1995 Tax Ct. Memo LEXIS 224; 69 T.C.M. (CCH) 2652; May 22, 1995, Filed *224 Decision will be entered under Rule 155. For petitioners: Lois C. Blaesing and Chauncey W. Tuttle, Jr.
For respondent: Mary P. Hamilton, Paul Colleran, and William T. Hayes. DAWSON, WOLFE
DAWSON; WOLFE
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE WOLFE, Special Trial Judge: This case is part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion *225 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transaction in this case are substantially identical to those in the Provizer case. Through a second tier partnership, Efron Investors, William I. Fine (petitioner) invested in the Clearwater Group limited partnership (Clearwater), the same partnership considered in the Provizer case. Pursuant to petitioners' request at trial, this Court took judicial notice of our opinion in the Provizer case. In a notice of deficiency, respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to Tax Under
Year
Deficiency
Sec. 6621(c)
1978
$ 2,897
[1]
1979
1,830
[1]
1980
2,507
[1]
1981
1,703
[1]
*226 The deficiencies for taxable years 1978, 1979, and 1980 result from disallowance of investment tax credit carrybacks and business energy credit carrybacks from taxable year 1981. In addition to the above deficiencies and additions to tax, in an amended answer, respondent asserted the following additions to petitioners' Federal income taxes: Additions to Tax Under
Year
Sec. 6653(a)
Sec. 6659
1978
$ 145
$ 869
1979
92
549
1980
125
752
1981
[1]
--
The issues for decision are: (1) Whether expert reports and testimony offered by respondent are admissible into evidence; (2) whether petitioners are entitled to claimed deductions and tax credits with respect to Clearwater as passed through Efron Investors to petitioner William I. Fine; (3) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations *227 under section 6653(a) for 1978, 1979, and 1980, and under section 6653(a)(1) and (2) for 1981; (4) whether petitioners are liable for the addition to tax under section 6659 for an underpayment of tax attributable to valuation overstatement; and (5) whether petitioners are liable for increased interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference. Petitioners resided in Munster, Indiana, when their petition was filed. During 1981, petitioner was a practicing attorney and an associate of the law firm Efron and Efron, P.C. Petitioner began working for Efron and Efron, P.C. in 1977. In 1978, petitioner Adele B. Fine was a secretary, and in 1979, 1980, and 1981, she was not employed outside the home. Petitioner is a limited partner in Efron Investors (EI), which is a limited partner in the Clearwater limited partnership. The Clearwater limited partnership is the same recycling partnership that we considered in Provizer v. Commissioner, supra. The underlying deficiency in this case resulted from respondent's disallowance *228 of claimed losses and tax credits that were passed through both Clearwater and EI to petitioner. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra.[2] Those facts may be summarized as follows. In 1981, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for $ 5,886,000 ($ 981,000 each). ECI Corp., in turn, resold the recyclers to F & G Corp. for $ 6,976,000 ($ 1,162,666 each). F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. We refer to these transactions collectively as the Clearwater transaction. The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $ 50,000. *229 PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC based on the quality and amount of recycled scrap. In 1981, petitioner acquired a 1.596-percent limited partnership interest in EI, and EI acquired a 43.313-percent limited partnership interest in Clearwater. As a result of passthrough from Clearwater and EI, on their 1981 Federal income tax return petitioners deducted an operating loss in the amount of $ 4,469 and claimed investment tax and business energy credits totaling $ 9,644. Petitioners used $ 858 of those credits to reduce their 1981 Federal income tax liability to zero and carried back unused investment tax and business energy credits in the amounts of $ 2,897, $ 1,830, and $ 2,507 to 1978, 1979, and 1980, respectively. [3] Petitioners allocated the remaining unused credits for carryforward to taxable year 1982 and thereafter. Respondent disallowed petitioners' claimed deductions and credits related to EI's investment in Clearwater for taxable years 1978, 1979, 1980, and 1981. *230 EI is an Indiana Limited Partnership that was formed in May of 1981 by Morton L. Efron (Efron) as the general partner and Real Estate Financial Corp. (REFC) as the initial limited partner. Fred Gordon (Gordon) is the president of REFC, which is owned by members of Gordon's family. EI was formed to acquire limited partnership interests in an office building in Buffalo, New York (the office building), and a shopping center in Haslett, Michigan (the shopping center). In contemplation of these ventures, EI prepared a private placement memorandum (the original offering memorandum) and distributed it to potential limited partners. At some time in late 1981, EI abandoned the contemplated investment in the shopping center and substituted limited partnership interests in Clearwater and a K-Mart shopping center in Swansea, Massachusetts (the K-Mart investment). The revised investment objectives were presented in a revised offering memorandum (the revised offering memorandum). The revised offering memorandum indicated that EI intended to invest in 100 percent of the limited partnership interests in the office building (10 units), 43.75 percent of the limited partnership interests in Clearwater *231 (7 units), and 15.625 percent of the limited partnership interests in the K-Mart investment (2 1/2 units). Potential EI limited partners were informed of the change in EI's investment objectives through informal conversations and the revised offering memorandum. Petitioner became aware of the change in EI's investment objectives shortly after the change occurred. MFA Corp. (MFA) is the ministerial agent for EI. Efron owns 50 percent of the stock of MFA and REFC owns the remaining 50 percent. The revised offering memorandum provides that Efron, as general partner of EI, and MFA, as the ministerial agent for EI, will receive substantial fees, compensation, and profits from EI. The contemplated payments to MFA include: (1) $ 100,000 for supervisory management of the office building and ministerial fees; (2) $ 100,000-$ 125,000 as loan commitment fees; (3) $ 25,000 for note collection guarantees; and (4) a maximum of $ 100,750 in investment advisory fees. In addition, MFA was also the ministerial agent for the office building limited partnership and, according to the revised offering memorandum, received substantial payments in that capacity. Efron obtained financing for the EI *232 investments through local banks. Some of the limited partners in EI made a cash downpayment to EI and then signed installment promissory notes for the remainder of the purchase price. Thereafter, Efron pledged any promissory notes received from limited partners as security for loans to EI. In addition to lending funds directly to EI, the banks also offered loans to individual limited partners for the downpayments needed with respect to the EI investments. Petitioner subscribed to purchase 1/4 of a limited partnership unit ($ 25,000) in EI. He acquired his interest in EI in exchange for a cash payment in the amount of $ 10,081.25 and a promissory note bearing interest at the rate of 11 percent per year with payments due in the amounts of $ 10,451.25 and $ 4,467.50 on January 15, 1982, and January 15, 1983, respectively. Petitioner borrowed all of the funds he required to finance acquisition of his interest in EI from the First Bank of Whiting. Petitioner completed arrangements for his loan with Donald Cassaday (Cassaday), a senior vice president of the First Bank of Whiting. Cassaday was involved with setting up the financing for EI with Efron and arranged required financing *233 for some of the EI limited partners. Cassaday enclosed a promissory note to petitioner in the amount of $ 22,157.50, with a letter dated December 18, 1981. The letter indicated that upon receipt of the executed promissory note, the First Bank of Whiting would disburse $ 11,706.25 to petitioner and that in January of 1982, they would disburse an additional $ 10,451.25. Thereafter, in 1982, the note would be renegotiated to provide for disbursement of the amount of petitioner's remaining obligation to EI. The note was secured by the EI investment and was only recourse against petitioner, not against petitioner Adele B. Fine or any assets owned in the entireties. Cassaday's letter indicates that petitioner's promissory note was to be reduced by payment immediately upon receipt of petitioner's tax refunds. As a result of petitioners' claimed investment tax credits and business energy credits with respect to EI's interest in Clearwater, petitioner claimed a Federal tax refund for 1981 in the amount of $ 2,739.48 [4] and tentative refunds for 1978, 1979, and 1980 in the aggregate amount of $ 7,233.89. *234 In 1981, petitioner learned of EI and the Clearwater transaction from Efron, his employer. In fact, petitioner worked on the EI offering under the supervision of Efron. He helped prepare the original offering memorandum, the limited partnership agreement, the subscription agreement, and the offeree questionnaire. At trial, petitioner could not recall if he aided Efron in preparing the revised offering memorandum, although he remembered the turmoil in the small law office when the deal was modified and documents had to be changed quickly. Efron was a principal member of the law firm that employed petitioner and also was the general partner of EI. In addition, Efron owned limited partnership interests in EI through Efron and Efron Real Estate, a partnership owned by Efron and his wife, and AMBI Real Estate, a partnership owned by Efron and his sister. EI was the first partnership for which Efron served as a general partner. Efron organized EI so that he could earn legal fees and fees for managing the partnership. He received compensation and fees as the general partner of EI and as a 50-percent shareholder of MFA. After EI abandoned the investment in the shopping center, Efron *235 learned of the Clearwater transaction from Gordon. In 1981 Gordon was counsel to EI, to Efron as the general partner of EI, to Efron personally, and to MFA. He and Efron have known each other since meeting at the University of Michigan in 1955. In the early 1960's, Efron and Gordon began investing together in the stock market, real estate, business loans, and other investments. Gordon is an attorney who holds a master's degree in business administration and at one time was employed by the Internal Revenue Service. Prior to the date of the Clearwater private placement offering, Gordon had experience involving the evaluation of tax shelters. Gordon was paid a fee in the amount of 10 percent of some investments he guided to Clearwater; however he did not receive directly a fee from Clearwater for the EI investments. Efron was aware that Gordon received commissions from the sale of some units in recycling ventures. Gordon recommended investing in the Clearwater offering to the investors in EI, as well as to some of Gordon's other clients. [5]
*236 Petitioner holds a bachelor of arts degree in English and a law degree from Indiana University, has earned 15 credit hours in pursuit of a master's degree in English literature at Purdue University, and has been a practicing attorney in Indiana since 1977. In 1977, he began to work as an associate for Efron and Efron, P.C. Petitioner Adele B. Fine holds a bachelor of science degree in psychology from Indiana University. Petitioners do not have any formal training in investments. Petitioners do not have any education or work experience in plastics recycling or plastics materials. Petitioners did not independently investigate the Sentinel recyclers. Petitioner did not see a Sentinel recycler or any other type of plastic recycler prior to participating in the recycling ventures. OPINION In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case involving the Clearwater transaction and another tier partnership, this Court (1) found that each Sentinel EPE recyclers had a fair market value not in excess of $ 50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section *237 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers. Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that petitioner's investment in the Sentinel EPE recyclers was similar to the investment described in Provizer v. Commissioner, supra, and, pursuant to their request, we have taken judicial notice of our opinion in the Provizer case. Petitioner invested in EI, a tier partnership that invested in Clearwater. The underlying transaction in this case (the Clearwater transaction), and the Sentinel EPE recyclers considered in this case, are the same transaction and machines considered in Provizer v. Commissioner, supra.
*238 Issue 1: Admissibility of Expert Reports and Testimony
Before addressing the substantive issues in this case, we resolve an evidentiary issue. At trial, respondent offered in evidence the expert opinions and testimony of Steven Grossman (Grossman) and Richard Lindstrom (Lindstrom). At trial and in their reply brief, petitioners object to the admissibility of the testimony and reports of Grossman and Lindstrom. The reports of both Grossman and Lindstrom contain two sections: (1) A section on valuation of the Sentinel EPE recyclers (part one); and (2) a section concerning the availability of information regarding recycling machines in 1981 and 1982 (part two). Part one of each report is substantially, if not exactly, identical to the expert reports received in evidence in Provizer v. Commissioner, supra. Part two of each report was prepared after trial of the Provizer case. The testimony of Grossman and Lindstrom predominantly relates to part two of their respective reports. Petitioners object to the testimony and reports of Grossman and Lindstrom in their entirety. They object to part one of the reports on the ground of relevancy, *239 and they object to part two and the testimony of Grossman and Lindstrom on the ground that Grossman and Lindstrom are not experts in the matters discussed in part two. In addition, petitioners specifically object to the admissibility of Grossman's report on the ground that it fails to meet the requirements of Rule 143(f) in that it does not include a list of Grossman's publications. We hold that the reports and testimony of Grossman and Lindstrom are relevant and admissible and that Grossman and Lindstrom are experts in the fields of plastics, engineering, and technical information. We do not, however, accept Grossman or Lindstrom as experts with respect to the ability of the average person, who has not had extensive education in science and engineering, to conduct technical research, and we have limited our consideration of their reports and testimony to the areas of their expertise. We also hold that the failure to include a list of Grossman's publications in his report did not unduly prejudice petitioners or deny them a reasonable opportunity to obtain evidence in rebuttal of his testimony and that Grossman's report meets the requirements of Rule 143(f). Issue 2: Deductions *240 and Tax Credits With Respect to EI and Clearwater
On their joint 1981 Federal income tax return, petitioners claimed the following with respect to petitioner's investment in EI and EI's investment in Clearwater: (1) Deductions in the amount of $ 4,469; (2) an investment tax credit in the amount of $ 4,822; and (3) a business energy credit in the amount of $ 4,822. [6] Respondent disallowed these claimed deductions and tax credits. The underlying transaction in this case is substantially identical in all respects to the transaction in Provizer v. Commissioner, T.C. Memo. 1992-177. The parties have stipulated the facts concerning the deficiency essentially as set forth in our Provizer opinion. Based on this record, we hold that the Clearwater *241 transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Accordingly, respondent is sustained on the issue with respect to the underlying deficiency. Moreover, we note that petitioners have stated their concession of this issue on brief. The record plainly supports respondent's determination regardless of such concession. For a detailed discussion of the facts and the applicable law, see Provizer v. Commissioner, supra.
Issue 3: Sec. 6653(a) Negligence
In her first amendment to answer, respondent asserted that petitioners were liable for the negligence additions to tax under section 6653(a) for 1978, 1979, 1980, and 1981. Because these additions to tax were raised for the first time in respondent's amendment to answer, respondent bears the burden of proof on this issue. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994). Section 6653(a) for taxable years 1978, 1979, and 1980 and section 6653(a)(1) for taxable year 1981 provide for an addition to tax equal to 5 percent of the underpayment if any *242 part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for taxable year 1981 provides for an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Petitioner contends that he was reasonable in claiming deductions and credits with respect to EI's investment in Clearwater. To support his contention, petitioner alleges the following: (1) That claiming the deductions and credits with respect to EI's investment in Clearwater was reasonable in light of the "oil crisis" in the United States in 1981; (2) that in claiming the deductions and *243 credits, petitioner specifically relied upon Efron, Cassaday, and Terry McMann (his father's accountant); and (3) that petitioner was a so-called unsophisticated investor. When petitioners claimed the disallowed deductions and tax credits, they had little, if any, knowledge of the plastics or recycling industries and no engineering or technical knowledge. Petitioners did not independently investigate the Sentinel EPE recyclers. Although petitioner was aware that the original EI offering had been changed and that a recycling investment in Clearwater was substituted for part of the shopping center investment, at the time of trial petitioner had not compared the revised offering memorandum and the original offering memorandum. Petitioner testified that the change in the nature of the EI offering from a strictly real estate deal, as presented in the original offering memorandum, to a deal involving a recycling investment concerned him, but he decided to invest in EI despite that change in investment objectives. The record does not clearly establish whether petitioner ever read the offering memorandum for Clearwater or the revised offering memorandum for EI. Petitioner argues, in *244 general terms, that because of the media coverage of a supposed oil or energy crisis in the United States during 1981, he believed that an investment in recycling had good economic potential. However, petitioner failed to explain precisely how the so-called oil crisis affected his decision to invest in the EI revised offering. Petitioners reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are distinctly different from the facts of this case. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion notes that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence-related additions to tax, this Court noted that one of the Government's expert witnesses acknowledged *245 that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology." Id. at 177. In the present case, however, one of respondent's experts, Grossman, noted that the price of plastics materials is not directly proportional to the price of oil, that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastic products". While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and early 1980's, there is no showing in this record that the supposed energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene. Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other *246 taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present case, petitioners were not experienced or educated in plastics recycling or plastics materials. They did not independently investigate the Sentinel recyclers, and they did not hire an expert in plastics to evaluate the Clearwater transaction. We consider petitioners' arguments with respect to the Krause case inapplicable. Moreover, during 1980 and 1981, in addition to the media coverage of the oil "crisis", there was "extensive continuing press coverage of questionable tax shelter plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). In light of the large tax benefits projected in the Clearwater offering memorandum and claimed on petitioners' 1981 Federal income tax return and petitioner's admitted observation of the media, we conclude that further investigation of the investment clearly was required. A reasonably prudent person would have *247 asked a qualified independent tax adviser if this windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. 827, 850 (1989). In fact, petitioner argues that he consulted qualified advisers and relied upon them in claiming the disallowed losses and tax credits. Petitioner argues that his reliance on the advice of Efron (his employer), Cassaday (a bank loan officer), and Terry McMann (his father's accountant) insulates him from the negligence-related additions to tax. Petitioner also mentions that he acquired additional information about the investment because of the proximity of his office to Efron's office. Under some circumstances a taxpayer may avoid liability for the additions to tax for negligence under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Such circumstances are not present in this case. Moreover, reliance on professional advice, standing alone, is not an absolute defense to negligence, *248 but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974). We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v. Commissioner, T.C. Memo. 1993-447. The record does not show that any of the persons upon whom petitioner allegedly relied possessed any special qualifications or professional skills in the recycling or plastics industries. In *249 addition, none of the persons allegedly relied upon by petitioner hired anyone with plastics or recycling expertise to evaluate the Clearwater transaction. In evaluating the Clearwater transaction, Efron contends that he relied upon (1) the offering materials, (2) Barry Swartz, an accountant, (3) various bankers who loaned funds to EI, and (4) Gordon for his expertise in taxation, finance, and investments. Although Efron testified that when making investments he knows "enough to go get an expert or somebody that knows something", Efron did not consult any plastics engineering or technical experts with respect to EI's investment in Clearwater. Efron relied heavily upon Gordon in deciding to include Clearwater as a part of the revised EI offering. Efron was aware that Gordon was an offeree representative, and received commissions as such, from other recycling investments. In evaluating the Clearwater transaction Gordon relied on the offering materials and on discussions with persons involved in the transaction. Petitioner first became aware of the Clearwater investments through EI and Efron. Petitioner contends that he relied heavily on Efron in making his investment in EI and *250 in claiming the associated tax deductions and credits and that he should be relieved of the negligence-related additions to tax under section 6653(a) because of his reliance on Efron. In his capacity as an associate attorney for Efron, petitioner worked on the EI offering materials. While working for Efron, petitioner became aware of Efron's success in personal investments. Petitioner testified that a "prime factor" in his decision to invest in EI was Efron's advice that the only way petitioner would accumulate significant personal wealth, like Efron, was to invest in speculations like EI, with borrowed funds. Nevertheless, Efron testified that he advised every limited partner in EI to talk to an independent adviser. The record is devoid of any further details concerning the advice petitioner received from Efron. Petitioner was aware that Efron was receiving substantial compensation and fees as the general partner of EI and as a 50-percent owner of MFA. In fact, one of petitioner's concerns about the EI investment was the substantial fees that Efron was generating from EI. Petitioners will not be relieved of negligence on the basis of their purported reliance on Efron. Petitioner *251 also contends that he relied on Cassaday in investing in EI and in claiming the disallowed deductions and credits. During 1981 Cassaday was an officer at the First Bank of Whiting. Cassaday arranged for the First Bank of Whiting to lend petitioner the entire amount of his investment in EI. The loan was secured by petitioner's investment in EI, required prompt repayment from any refunds resulting from tax credits, and was not recourse against petitioner Adele B. Fine or assets owned by the entireties by petitioners. Petitioner approached Cassaday to request the loan because it was petitioner's understanding that Cassaday was familiar with the EI offering, that Cassaday was involved with Efron in financing the underlying EI investments, and that Cassaday was financing the EI limited partnerships for other investors. Petitioner testified that he assumed that the limited recourse nature of the loan was a "wholehearted approval of the investment" by Cassaday. Petitioner provided no further details of his inquiry of Cassaday or the advice he received from Cassaday. Petitioner's purported reliance on Cassaday's willingness to authorize a loan, payable in part from anticipated tax *252 refunds, as a basis for making the investment was not reasonable. Petitioner contends that he also relied on his father's accountant, Terry McMann (McMann). Petitioner's testimony was general and vague, providing no details of the advice he received from McMann. In fact, petitioner himself never spoke with McMann. Petitioner testified that he delivered a copy of the EI offering memorandum [7] to petitioner's father who, in turn, gave it to McMann. Petitioner testified that, thereafter, his father reported back to him on McMann's opinion about EI. At trial, petitioner did not reveal what advice, if any, he received from McMann through his father. Petitioner does not seriously contend that McMann possessed any firsthand knowledge of the Clearwater transaction or the requisite expertise in recycling or the plastics industry to permit an evaluation of the merits of EI or the Clearwater transaction. Petitioner's reliance on McMann was not reasonable. *253 Petitioner also explained: I had also, because my office was next to Mr. Efron's, heard the conversations with people who came in and talked to him either on his phone or in person in his office. So I was privy to a lot of conversation about the investments, hearing from a number of sources.
Such eavesdropping, voluntary or involuntary, is not a reasonable basis for petitioners' investment decisions. In our view, petitioner's purported reliance on Efron, Cassaday, and McMann, and on various eavesdropping was not reasonable, in good faith, and based on full disclosure. Accordingly, we hold that petitioners are not entitled to relief from the negligence-related additions to tax under section 6653(a) because of their alleged reliance on professional advice. Petitioners' reliance on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, is misplaced. The facts in the Heasley case are distinctly different from the facts of this case. In the Heasley case the taxpayers were not educated beyond high school, while in the instant case petitioner was a highly educated attorney who *254 worked in the office of the promoter of the EI investment. Moreover, petitioner actually worked on the EI offering materials. We consider petitioners' arguments with respect to the Heasley case inapplicable. Petitioner entered into the EI investment without any knowledge or background with respect to plastics or recycling and without seeking the advice of anyone who had such knowledge. Petitioner did not examine any Sentinel EPE recyclers prior to investing in EI, and he did not seek the advice of an independent third party concerning the machines' values. Moreover, petitioner never had any significant amount of his own money in the deal. Petitioner (1) borrowed virtually all of the funds that he invested in EI through a loan officer, Cassaday, who was involved with the financing of EI, (2) used credits generated from EI's investment in Clearwater to repay a substantial portion of the loan, (3) used his EI investment as security for any remaining balance on the loan, and (4) was left with an interest in EI's real estate investments. EI appears to have been an investment made available to petitioner as a tax shelter but without the requirement that he make any significant *255 cash expenditure. Under the circumstances of this case, petitioner should have known better than to claim the large deductions and tax credits with respect to Clearwater on petitioners' Federal income tax returns. We conclude that petitioners were negligent in claiming the deductions and credits with respect to EI's investment in Clearwater on their Federal income tax returns for 1978, 1979, 1980, and 1981. We hold, upon consideration of the entire record, that petitioners are liable for the negligence-related additions to tax under the provisions of section 6653(a) for 1978, 1979, and 1980, and under the provisions of section 6653(a)(1) and (2) for 1981. Respondent is sustained on this issue. Issue 4. Sec. 6659 Valuation Overstatement
In her first amendment to answer, respondent asserted that petitioners were liable for the addition to tax for valuation overstatement under section 6659 on the underpayment of their 1978, 1979, and 1980 Federal income taxes attributable to the investment tax credit and business energy credit claimed with respect to EI and Clearwater. [8] Because these additions to tax were raised for the first time in respondent's amendment to answer, respondent *256 bears the burden of proof on this issue. Rule 142(a); Vecchio v. Commissioner, 103 T.C. at 196. A graduated addition to tax is imposed when an individual has an underpayment of tax which equals or exceeds $ 1,000 and is attributable to a valuation overstatement. Sec. 6659(a) and (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 present of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b). Petitioners claimed an investment tax credit and a business energy credit based on purported values of $ 1,162,666 for each Sentinel EPE *257 recycler. Petitioners have conceded that the fair market value of each recycler was not in excess of $ 50,000. Therefore, if disallowance of petitioners' claimed credits is "attributable to" the valuation overstatement, petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the credit claimed with respect to EI and Clearwater. Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. See Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements. Krause v. Commissioner, 99 T.C. at 178, citing Todd v. Commissioner, supra.However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), *258 affg. T.C. Memo. 1991-449; Masters v. Commissioner, T.C. Memo. 1994-197; Harness v. Commissioner, T.C. Memo. 1991-321; see Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1989-684 (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement). Petitioners stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, T.C. Memo. 1992-177. In the Provizer case we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers. In both Provizer v. Commissioner, supra, and the instant case, the overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings that the Clearwater transaction was a sham and lacked economic substance. On brief, petitioners seek to distinguish Provizer v. Commissioner, supra, *259 from the instant case by attempting to concede disallowance of the credits claimed with respect to EI and Clearwater on the ground that the Sentinel EPE recyclers leased by Clearwater were not placed in service during 1981. Petitioner, at this late date, is attempting to claim some advantage by taking a position, contrary to the position taken on petitioners' 1981 Federal income tax return and contrary to the position of EI as indicated on the partnership return for 1981. Petitioners' attempted concession is inconsistent with everything petitioners and their associates contended earlier. Petitioners' position is that this concession, if accepted by the Court, might result in the disallowance of the credits on grounds other than overvaluation, rendering the overvaluation addition inapplicable. See McCrary v. Commissioner, 92 T.C. at 852-854; Todd v. Commissioner, supra.
We consider petitioners' belated attempted concession inappropriate. When taxpayers have sought to avoid the addition to tax under section 6659 by conceding, on brief, disallowance of claimed deductions and credits on the grounds that equipment *260 was not placed in service during the years in issue, this Court repeatedly has declined to accept the concession. See Whittaker v. Commissioner, T.C. Memo. 1992-29, affd. without published opinion 993 F.2d 1541 (4th Cir. 1993); Morrissey v. Commissioner, T.C. Memo. 1989-646; Pacheco v. Commissioner, T.C. Memo. 1989-296; Looney v. Commissioner, T.C. Memo. 1988-332. Similarly, in the instant case, we decline to allow petitioners to avoid the addition to tax for overvaluation by conceding the issue on brief. Moreover, the record is inconclusive with respect to the placing in service of the Sentinel EPE recyclers during 1981. At petitioners' request, we took judicial notice of the opinion in the Provizer case. In the Provizer case we sustained respondent's disallowance of the claimed deductions and credits solely on the grounds that the Clearwater transaction was a sham and lacked economic substance. We did not hold that the recyclers were not placed in service. The parties specifically stipulated the following language from *261 our Provizer opinion: None of * * * [the six Sentinel EPE recyclers leased by the Clearwater partnership] were shipped to an end-user by the end of 1981. Two of the six machines never worked and remained for most of 1981 through 1985 in a * * * [Packaging Industries] warehouse. One machine was sent unsolicited to a company which refused to take the machine and immediately returned the invoice to * * * [Packaging Industries].
For purposes of the investment tax credit and the business energy credit, property is "placed in service" when it is "placed in a condition or state of readiness and availability for a specifically assigned function". Sec. 1.46-3(d)(1)(ii), Income Tax Regs. As in other cases involving the same Clearwater equipment, e.g. Provizer v. Commissioner, supra; Eisenberg v. Commissioner, T.C. Memo. 1995-180, the record in this case does not support the contention that the recyclers were not placed in service during 1981. In 1981, the recyclers were simultaneously sold by PI to ECI Corp., sold to F & G Corp., leased to Clearwater, licensed to FMEC Corp., and sublicensed to PI. Leases for *262 the recyclers were acquired by Clearwater, but the recyclers were not delivered to the places of business of end-users. Equipment need not be so delivered to end-users in order for the equipment to be considered "placed in service" for purposes of section 46. See Cooper v. Commissioner, 88 T.C. 84, 113-114 (1987). Equipment is still placed in service even though it is not in actual use during the year in issue if it is nevertheless devoted to the business of the partnership and ready for use should the occasion arise. Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Clemente, Inc. v. Commissioner, T.C. Memo. 1985-367. Based on the entire record in this case, we can not conclude that the Clearwater Sentinel EPE recyclers were not, in fact, placed in service during 1981. We disallowed petitioners' claimed investment tax credit and business energy credit with respect to EI and Clearwater on the grounds that the Clearwater transaction was a sham and lacked economic substance, and that holding was based on the overvaluation of the *263 recyclers which was integral to the entire transaction. Where a transaction lacks economic substance, the taxpayer takes a zero basis in the asset upon which the taxpayer claims entitlement to the investment credit and any basis claimed in excess of that is a valuation overstatement. Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991); Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993). If the finding of lack of economic substance is due to an overvaluation, the deficiency is attributable to an overstatement of value and is subject to the section 6659 addition to tax. Illes v. Commissioner, 982 F.2d at 167. Disallowance of the claimed credits was based upon the overvaluation and is "attributable to" the valuation overstatement. Here the *264 underpayment of taxes that related to petitioners' improper claiming of the investment tax and business energy credits is attributable to overvaluation of the Sentinel EPE recyclers, and the overvaluation is more than 250 percent. Accordingly, petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed credits for 1981. [9]
Petitioners also contend that respondent erroneously failed to waive the section 6659 addition to tax. Section 6659(e) authorizes respondent to waive all or part of the addition *265 to tax for a valuation overstatement if the taxpayer establishes that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith. Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion. Krause v. Commissioner, 99 T.C. at 179. Based on this record, we conclude that respondent did not abuse her discretion in failing to waive the section 6659 addition to tax. Petitioners now contend that their alleged reliance on specified individuals in arriving at the claimed valuation was reasonable, and, therefore, respondent should have waived the section 6659 addition to tax. We note that in this case, we have found that petitioner's purported reliance on specified individuals, all of whom lacked experience in the plastics or recycling industries, was unreasonable. Moreover, the record fails to indicate that petitioners ever requested a waiver from respondent pursuant to section 6659(e) until briefing after trial. We are reluctant to find that respondent abused her discretion here when, for all the record shows, she was not even timely *266 requested to exercise it. See Haught v. Commissioner, T.C. Memo. 1993-58; Lapin v. Commissioner, T.C. Memo. 1990-343, affd. without published opinion 956 F.2d 1167 (9th Cir. 1992). The record in this case does not establish an abuse of discretion on the part of respondent but supports respondent's position. Accordingly, we hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion. Respondent is sustained on this issue. Issue 5: Sec. 6621(c) Tax-Motivated Transactions
Respondent determined that interest on deficiencies accruing after December 31, 1984, would be calculated under section 6621(c). The annual rate of interest under section 6621(c) equals 120 percent of the interest payable under section 6601 with respect to any substantial underpayment attributable to tax-motivated transactions. An underpayment is substantial if it exceeds $ 1,000. Sec. 6621(c)(2). The term "tax motivated transaction" includes "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). In this case, the Clearwater transaction lacked economic substance and *267 was a sham. Transactions devoid of economic substance are sham transactions for purposes of section 6621(c)(3)(A)(v). Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054, 1068 (1988); Cherin v. Commissioner, 89 T.C. 986, 1000 (1987). Therefore, by definition the transaction is tax-motivated under section 6621(c)(3)(A)(v). Moreover, the term "tax motivated transaction" includes any section 6659(c) valuation overstatement. Sec. 6621(c)(3)(A)(i). In 1981, petitioners claimed a value for the recyclers in excess of 150 percent of the true value of the recyclers. Therefore, petitioners had a valuation overstatement as defined in section 6659(c). For section 6621(c) interest to apply, the underpayment of taxes must be "attributable to" a tax-motivated transaction. Where a valuation overstatement or other category of tax-motivated transaction is an integral part of or inseparable from the ground for disallowance of an item, section 6621(c) increased interest applies. See McCrary v. Commissioner, 92 T.C. at 859. We disallowed petitioners' claimed deductions and credits with respect to *268 EI's investment in Clearwater because the transaction lacked economic substance and was a sham. We found that the transaction lacked economic substance and was a sham largely because the recyclers were overvalued. Our finding of a valuation overstatement was an integral part of and inseparable from our finding that the transaction lacked economic substance and was a sham. Accordingly, respondent's determination as to the applicable interest rate for deficiencies attributable to tax-motivated transactions is sustained, and the increased rate of interest applies for the taxable year in issue. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the tax years at issue, unless otherwise stated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. The notice of deficiency refers to sec. 6621(d). This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744 and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989 (sec. 7721(d) of the Act). The repeal does not affect the instant cases. For simplicity, we shall refer to this section as sec. 6621(c). The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601↩ with respect to any substantial underpayment attributable to tax-motivated transactions.
1. Respondent determined that petitioners were liable for the addition to tax under sec. 6653(a)(1) in the amount of $ 85 and the addition to tax under sec. 6653(a)(2)↩ in an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.
2. The parties did not stipulate certain facts concerning the Provizers, facts regarding the expert opinions, and other matters that we consider of minimal significance. Although the parties did not stipulate our findings regarding the expert opinions, they stipulated our ultimate finding of fact concerning the fair market value of the recyclers during 1981.↩
3. Petitioners filed a Form 1045, Application for Tentative Refund, claiming overpayments for 1978, 1979, and 1980 as a result of the carrybacks.↩
4. Only $ 858 of petitioners' claimed refund related to the investment in EI and EI's investment in Clearwater. The record is unclear with respect to the amount of petitioners' 1981 Federal income tax refund that they applied toward repayment of the loan.↩
5. The Clearwater offering memorandum states that the partnership will pay sales commissions and fees to offering representatives in an amount equal to 10 percent of the price paid by the investor represented by such person. The offering memorandum further states that if such fees are not paid "they will either be retained by the general partner as additional compensation if permitted by applicable state law, or applied in reduction of the subscription price." The Efron investors' Schedule K-1 for 1981 shows that EI paid full price, $ 350,000, for its 7 units of Clearwater, so the 10-percent-commission was not applied to reduce the subscription price. Gordon specifically stated that in the case of EI he did not directly receive the sales commission. Efron expressed doubt that he individually had been an offeree representative in connection with Clearwater or any other transaction. There are suggestions that the commission might have been paid to MFA and that individual investors consulted offeree representatives, but the record on this subject is inconclusive.↩
6. Although petitioners did not utilize all of their claimed investment tax and business energy credits on their 1981 Federal income tax return, they claimed carrybacks for most of the credits and the remainder were available for carry forward.↩
7. Petitioner's testimony is vague. The record is unclear on whether McMann received a copy of the original offering memorandum, a copy of the revised offering memorandum, or copies of both.↩
8. The underpayment of taxes allegedly attributable to the purported valuation overstatement did not exceed $ 1,000 for 1981, and respondent did not assert the addition to tax under sec. 6659↩ for that year. See rec. 6659(d).
9. Sec. 6659 applies to returns filed after Dec. 31, 1981. Although petitioners filed returns for 1978, 1979, and 1980 prior to Dec. 31, 1981, they are liable for additions to tax under sec. 6659 with respect to those years because the underpayments of tax for those years are attributable to the carryback of unused tax credits claimed on their return for 1981. Nielsen v. Commissioner, 87 T.C. 779↩ (1986).